MARISOL A., By her Next Friend, Rev. Dr. James Alexander FORBES, Jr.; Lawrence B., by his next friend, Prof. Mitchell I. Ginsberg; Thomas C., by his next friend, Dr. Margaret T. McHugh; Shauna D., by her next friend, Prof. Kathryn Conroy; Ozzie E., by his next friends, Jill Chaifetz and Kim Hawkins; Darren F. and David F., by their next friends, Juan A. Figueroa and Rev. Marvin J. Owens; Bill G. and Victoria G., by their next friend, Sister Dolores Gartanutti; Brandon H., by his next friend, Thomas J. Moloney; and Steven I., by his next friend, Kevin Ryan, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Rudolph W. GIULIANI, Mayor of the City of New York; Marva Livingston Hammons, Administrator of the Human Resources Administration and Commissioner of the Department of Social Services of the City of New York; Nicholas Scoppetta, Commissioner of the New York City Administration for Children's Services; George E. Pataki, Governor of the State of New York; and Brian J. Wing, Acting Commissioner of the Department of Social Services of the State of New York, Defendants.

No. 95 Civ. 10533 (RJW).

United States District Court, S.D. New York.

June 18, 1996.

See also 929 F.Supp. 660.

Children's Rights, Inc., New York City (Marcia Robinson Lowry, Craig Levine, Mark G. Peters, Rebecca Kim Kimura, Martha Stone, of Counsel), Lawyers For Children, Inc., New York City (Gayle Lerner, Karen Freedman, of Counsel), for Plaintiffs.

Corporation Counsel of the City of New York, New York City, Paul A. Crotty, Corporation Counsel (Grace Goodman, Phyllis Seidman, of Counsel), for City Defendants.

Attorney General of the State of New York, New York City, Dennis C. Vacco, Attorney General (Ronald Younkins, Michael S. Popkin, Steven M. Connolly, of Counsel), for State Defendants.

## OPINION

ROBERT J. WARD, District Judge.

Defendants Rudolph W. Giuliani, Marva Livingston Hammonds, and Nicholas Scoppetta ("City defendants") have moved pursuant to Rule 12(b)(6), Fed.R.Civ.P., for an order dismissing large portions of plaintiffs' complaint filed on December 3, 1995 for failure to state a claim upon which relief can be granted. Defendants George E. Pataki and Brian J. Wing ("State defendants") likewise have moved pursuant to Rule 12(b)(6), Fed.R.Civ.P., for a partial order of dismissal. Plaintiffs have moved, pursuant to Rule 23, Fed.R.Civ.P., for an order certifying this action as a class action. Finally, City defendants have moved for an order bifurcating this action.

For the reasons hereinafter stated, defendants' motions to dismiss are denied to the extent that (1) custodial plaintiffs may pursue their substantive due process claims based upon alleged violations of their right to be free from harm and all plaintiffs may pursue their procedural due process claims based upon alleged violations of various provisions of New York's Child Protective Services laws, codified at Title 6 of Article 6 of the New York Social Services Law; (2) plaintiffs may pursue their federal statutory claims based upon the Adoption Assistance and Child Welfare Act, including the provision herein referred to as the Multiethnic Placement Act, the Child Abuse Prevention and Treatment Act, the Americans with Disabilities Act, and the Rehabilitation Act; and (3) plaintiffs may pursue their state law claims. Further, plaintiffs' motion for class certification is granted. Finally, City defendants' motion to bifurcate this action is denied.

## BACKGROUND

Plaintiffs are eleven children all of whom have suffered, and some of whom continue to be at risk of, severe abuse and neglect. These children allege that defendants, who are officials with responsibility for the Child Welfare Administration of the City of New York ("CWA") now renamed the New York City Administration for Children's Services ("ACS"),[1] mishandled plaintiffs' cases and, through defendants' actions or inactions, deprived plaintiffs of their rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution, under Article XVII of the New York State Constitution, as well as under numerous federal and state statutes.

The factual allegations of the complaint portray a child welfare program in crisis and collectively suggest systemic deficiencies of gross proportions. The eleven children who seek to represent the proposed class have endured a wide range of abuses

1. On February 12, 1996, Mayor Giuliani removed CWA from the Human Resources Administration ("HRA") bureaucracy and, in its place, established ACS as an independent agency. Pursuant to an order signed by this Court on March 11, 1996, Nicholas Scoppetta, the newly-appointed ACS Commissioner, was substituted as a defendant for Kathryn Croft, formerly the Executive Deputy Commissioner of CWA. Further, all references either to CWA or ACS were deemed to refer to CWA up to and including February 11, 1996 and to ACS on February 12, 1996 and thereafter. This Court will refer, therefore, to ACS unless describing events which took place prior to that date.

and all reflect the dire situation facing children in the system. In their complaint, the named plaintiffs allege the following facts:

Marisol A. is a five-year old who was born two days after her mother, Ms. A., was arrested on charges of dealing drugs. CWA placed Marisol with Ms. C. during and subsequent to Ms. A.'s incarceration but, in 1994, CWA restored Marisol to her mother's custody despite her criminal history and reports that she was abusing Marisol during visitations. CWA failed to assess properly the appropriateness of this placement and took no steps to supervise or monitor Ms. A.'s home. Upon regaining custody, Ms. A. confined Marisol to a closet for several months, deprived her of sustenance resulting in her eating her own feces and plastic garbage bags to survive, and both physically and sexually abused her to the point of injury. During this period, Ms. A.'s sister and Ms. C. filed multiple reports of abuse with CWA to no avail. A housing inspector familiar with the signs of abuse discovered Marisol during a chance visit and reported the situation to the police. Despite Ms. C.'s eagerness to adopt Marisol, CWA has not begun the process of terminating Ms. A.'s paren-

tal rights and has not provided Marisol with counseling or support services.

Lawrence B. died on February 18, 1996 of AIDS-related illness at the age of nineteen.[2] Lawrence's mother died of AIDS in or around 1985 leaving him an orphan and he entered the foster care system in 1995, at age seventeen, pursuant to a voluntary agreement signed by his aunt who could no longer care for him. After taking custody, CWA failed to assess Lawrence's medical condition for almost two months and then shuttled him from one inappropriate placement to another. Lawrence first spent seven months in a diagnostic facility and then was transferred to a group home that lacked the medical staff needed to monitor his condition. In fact, CWA neglected even to inform the agency of Lawrence's HIV-positive status. Finally, CWA placed Lawrence in a group home aimed to assist teenagers in making the transition to independent living. CWA again failed to alert that agency to Lawrence's medical condition. Even when the agency notified CWA that Lawrence needed hospice care, CWA suggested that the staff simply take him to the hospital when necessary. Despite his deteriorating health, CWA recommended

**2.** The parties disagree as to whether the claims represented by Lawrence B. survive his death for purposes of class certification. Counsel for City defendants summarily asserts that "all claims for injunctive relief asserted by 'Lawrence B' are mooted, including his claim to act as a representative plaintiff for a class of persons asserting claims under the Rehabilitation Act and/or the Americans With Disabilities Act." Affirmation to Suggest on the Record the Death of a Plaintiff at 2. Counsel further argues that "it seems fruitless to speculate as to the survival of the claim in the absence of a substituted plaintiff." Letter to the Court from Grace Goodman dated April 5, 1996. The Court is not persuaded by these unsupported and conclusory allegations.

Generally, a court cannot certify a class action unless there exists a named plaintiff with a live controversy both at the time the complaint is filed and at the time the class is certified. *Swan v. Stoneman,* 635 F.2d 97, 102 n. 6 (2d Cir.1980). The Supreme Court has recognized, however, that the doctrine of class certification is flexible and has noted that

[t]here may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances,

whether the certification can be said to "relate back" to the filing of the complaint may depend upon the circumstances of the particular case....

*Sosna v. Iowa,* 419 U.S. 393, 402 n. 11, 95 S.Ct. 553, 559 n. 11, 42 L.Ed.2d 532 (1975). The Second Circuit has affirmed this principle noting that there may be exceptions to the general rule requiring a live controversy at the time that the class is certified. *See Swan,* 635 F.2d at 102 n. 6; *see also Comer v. Cisneros,* 37 F.3d 775, 797 (2d Cir.1994); *White v. Mathews,* 559 F.2d 852, 857 (2d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Indeed, this Court has certified a class and applied the "relation back" doctrine where a named plaintiff's claim was mooted after the filing of a motion for class certification but prior to the resolution of that motion. *See Kendrick v. Sullivan,* 784 F.Supp. 94, 104 n. 5 (S.D.N.Y.1992).

Here, Lawrence B. died after the filing of the complaint and instant motions but several weeks prior to oral argument on those motions. It was, therefore, impossible for this Court to have adjudicated the class certification motion while Lawrence was alive. Nevertheless, the Court is persuaded that Lawrence's claims survive his death and that substitution of a new class representative is unnecessary.

continued placement in the group home and maintained a goal of independent living in his case plan until his death.

Thomas C. is a fifteen-year old who has been in foster care since he was seven. In those eight years, Thomas endured numerous placements including a hospital, a diagnostic center, and a residential treatment center ("RTC"). In 1993, without adequate investigation, CWA approved Thomas' placement with Rev. D., a minister Thomas met at the RTC, who took him to South Carolina. There Rev. D. sexually abused Thomas who subsequently ran away. In 1994, Thomas was returned to the RTC where he now resides. He has since attempted suicide twice and has run away from the RTC only to return after facing hardship and abuse on the streets. CWA has failed to determine the appropriateness of the RTC placement, to pursue the possibility of adoption, or to provide Thomas with counseling.

Shauna D. is a two-year old who lives with Ms. D., her drug-addicted mother. CWA has failed to investigate reports of suspected abuse despite the fact that Ms. D. has already lost custody of her six other children. In September 1995, Ms. M., a friend who had been caring for Shauna, filed for formal custody. In November 1995, however, Ms. D. forcibly took Shauna from Ms. M.'s home. Despite repeated calls from Shauna's law guardian, her CWA caseworker has failed to investigate adequately reports of abuse or to ensure that Ms. D. is in a drug rehabilitation program.

Ozzie E. is a fourteen-year old who suffers from seizure disorder, brain lesions, and behavioral problems. In 1995, Ozzie's father placed him in foster care after finding himself unable to care for Ozzie. Although Ozzie and his mother, Ms. E., both want to be reunited, he remains in a group home because CWA has failed to provide any family preservation services to enable Ms. E. to care for him. Although CWA acknowledges that the group home is not equipped to address Ozzie's neurological problems, the agency has taken no steps to return Ozzie to his mother.

Darren F. and David F. are seven-year old twins who have been in foster care since they were one. In 1990, CWA placed the twins with their grandmother who was too old to care for them and from whom they were removed after she allowed their drug-addicted mother to live with them. In 1991, CWA placed the twins, who already were evidencing signs of psychological trauma, with Ms. R. who made efforts to address the children's special needs. Despite Ms. R.'s requests, CWA failed to provide the twins with treatment as their behavior deteriorated. Finally, a psychiatrist recommended that, because of their young age, they remain with Ms. R. but enroll in a day treatment center. CWA, however, placed the twins in an inappropriate residential center where they remain today and has risked their chance to be adopted by Ms. R.

Bill G. is a fourteen-year old who is mentally retarded and suffers from a mild form of cerebral palsy. His sister, Victoria G., is ten. In 1985, CWA placed them together in the home of Ms. H. pursuant to a finding of parental neglect. The children's permanency goal was to return to their parents, Mr. and Mrs. G., and the case plan outlined steps for their parents to follow in that regard. CWA, however, failed to monitor the parents' progress and the children remained with Ms. H. even after her legal authority had lapsed. In 1989, Mr. and Mrs. G. agreed to voluntary placement but, during their infrequent visits, beat the children. Despite all of these factors, CWA still failed to obtain a termination of parental rights and has considered returning them to their father after they have spent more than ten years in Ms. H.'s care.

Brandon H. is a seven-year old who was placed in foster care at birth because his mother was twelve at the time and in foster care herself. In early 1992, CWA placed Brandon with Ms. W. but did not file a petition seeking termination of parental rights until later that year. The court terminated those rights in 1994 but, despite Ms. W.'s willingness to adopt him, CWA still has not even taken steps to transfer Brandon's case to the agency's

adoption division. CWA thus allows Brandon to remain in foster care without addressing his need for permanency.

Steven I. is a sixteen-year old who has developed severe psychiatric and emotional problems after spending his entire life in foster care. Steven exhibits violent behavior and, by age twelve, Steven had attempted to rape a nine-year old girl, had stabbed other children with pencils, and had lit several fires. After CWA ignored a recommendation that Steven receive long-term residential treatment, his behavior deteriorated to the point that, at age fifteen, he was committed to New York Hospital as a "sexual predator." Upon his release, CWA placed him in an inappropriate group home from which he ran away in 1994. He now lives on the streets and CWA has failed to locate him or to provide him with any treatment.

*See* Complaint for Declaratory and Injunctive Relief at 27–62 [hereinafter "Complaint"].

In support of their claims, plaintiffs specifically allege that defendants fail to:

(1) appropriately accept reports of abuse and neglect for investigation;

(2) investigate those reports in the time and manner required by law;

(3) provide mandated preplacement preventive services to enable children to remain at home whenever possible;

(4) provide the least restrictive, most family-like placement to meet children's individual needs;

(5) provide services to ensure that children do not deteriorate physically, psychologically, educationally, or otherwise while in CWA custody;

(6) provide children with disabilities, including HIV/AIDS, with appropriate placements;

(7) provide appropriate case management or plans that enable children to return home or be discharged to permanent placements as quickly as possible;

(8) provide services to assist children who are appropriate for adoption in getting out of foster care;

(9) provide teenagers adequate services to prepare them to live independently once they leave the system;

(10) provide the administrative, judicial, or dispositional reviews to which children are entitled;

(11) provide caseworkers with training, support, or supervision; and

(12) maintain adequate systems to monitor, track, and plan for children.

*See* Complaint at 2–4.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 which provides in pertinent part:

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983. They allege that defendants have violated and continue to violate their rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution; the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–28, 670–79a ("Adoption Assistance Act"), including the provision herein referred to as the Multiethnic Placement Act of 1994, 42 U.S.C. § 622(b)(9); the Child Abuse Prevention and Treatment Act, 42 U.S.C. §§ 5101–06a ("CAPTA"); provisions of the Medicaid Act, 42 U.S.C. §§ 1396a, 1396d(a) and (r); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); § 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, 794a ("Rehabilitation Act"); Article XVII of the New York State Constitution; Articles 2, 3, 6, and 7 of the New York State Social Services Law; Articles 6 and 10 of the New York State Family Court Act; state regulations codified at 18 N.Y.C.R.R. §§ 400–484; and other state plans. Plaintiffs seek injunctive or declaratory relief as needed to remedy defendants' alleged violations and, further, request the appointment of

a receiver with full authority to oversee and direct the implementation of all the

injunctive relief granted by the court, to restructure the New York City child welfare system, and to take all steps necessary to ensure that the child welfare system operates in full compliance with all applicable law.

Complaint at 108. Finally, plaintiffs ask this Court to retain jurisdiction over the matter to monitor the implementation of such relief.

Before this Court are motions by both City and State defendants pursuant to Rule 12(b)(6), Fed.R.Civ.P., for an order dismissing the bulk of plaintiffs' federal constitutional and statutory claims as well as plaintiffs' state law claims. Also before the Court is plaintiffs' motion pursuant to Rule 23, Fed. R.Civ.P., for an order certifying this action as a class action on behalf of:

> [a]ll children who are or will be in the custody of the New York City Child Welfare Administration ("CWA"), and those children who, while not in the custody of CWA, are or will be at risk of neglect or abuse and whose status is known or should be known to CWA[.]

Notice of Motion for Class Certification at 1. Finally, City defendants have moved for an order bifurcating this action.

## DISCUSSION

### I. Motions to Dismiss

Defendants seek dismissal of large portions of plaintiffs' complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted. In the alternative, defendants ask this Court either to decline to exercise supplemental jurisdiction over plaintiffs' state law claims or to find those claims non-justiciable. Finally, defendants ask this Court to refuse to decide plaintiffs' claims, City defendants relying on the *Burford* abstention doctrine and State defendants relying on the *Younger* abstention doctrine.

■ In deciding a motion to dismiss, this Court must accept as true the factual allegations set forth in the complaint and must draw all reasonable inferences in plaintiffs' favor. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81

L.Ed.2d 59 (1984); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996). The Court, therefore, "may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232; *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Further, "[a] court must construe pleadings liberally, and mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." *Aristotle P. v. Johnson,* 721 F.Supp. 1002, 1004 (N.D.Ill.1989) (citation omitted). In civil rights actions, courts must apply this standard with even greater force. *See Bernheim,* 79 F.3d at 321; *Aristotle,* 721 F.Supp. at 1004.

### A. Plaintiffs' Federal Constitutional Claims

■ 42 U.S.C. § 1983 establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. § 1983 is, therefore, a vehicle through which a private plaintiff may pursue a claim for an alleged constitutional violation by a person acting under color of state law. *See Golden State Transit Corp. v. City of L.A.,* 493 U.S. 103, 105, 110 S.Ct. 444, 447, 107 L.Ed.2d 420 (1989); *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). Plaintiffs thus properly rely on § 1983 to pursue their claims of federal constitutional deprivations.

Defendants ask this Court to dismiss plaintiffs' first cause of action which alleges violations of their rights derived from the First, Ninth, and Fourteenth Amendments to the United States Constitution. Although plaintiffs' first cause of action contains more specific language, their federal constitutional claims can be divided loosely into two significant categories: (1) violation of plaintiffs' substantive due process right to protection from harm while in state custody; and (2) violation of plaintiffs' right not to be deprived of entitlements created by New York State

law without due process.[3]

### 1. *Substantive Due Process Claims*

■ Defendants move to dismiss the first significant component of plaintiffs' first cause of action in which they assert that defendants have, through their actions or inactions, violated plaintiffs' substantive due process right to be free from harm. Defendants argue that, unlike the custodial plaintiffs whose claims defendants do not challenge, those children who are not in ACS custody have no federal substantive due process right to be protected from harm in light of the Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Defendants assert, therefore, that non-custodial plaintiffs fail to state a substantive due process claim upon which relief can be granted. This Court agrees. Indeed, plaintiffs concede that "[t]he non-custodial plaintiffs' constitutional claim is limited to their right not to be denied the protections and benefits of the detailed state law regarding child protection without due process." Pls.' Mem. in Opp'n at 30. The following analysis of plaintiffs' substantive due process claims, therefore, applies only to custodial plaintiffs.

■ Under certain circumstances, the federal Constitution imposes upon the government an affirmative duty to provide services and care to individuals in state custody. *See DeShaney*, 489 U.S. at 198, 109 S.Ct. at 1004. The Supreme Court first recognized this obligation by granting incarcerated prisoners the right to adequate medical care pursuant to the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Shortly thereafter, the Court extended this analysis and required the state to ensure the safety of involuntarily committed mental patients pursuant to the substantive component of the Fourteenth Amendment's Due Process Clause. *See Youngberg v. Romeo*, 457 U.S. 307, 314–25, 102 S.Ct. 2452, 2457–63, 73 L.Ed.2d 28 (1982). The Court, interpreting this line of cases, has noted that "[t]aken together, they stand ... for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. at 1005. Under the *Youngberg* line of cases, therefore, the government must provide to those individuals in its custody reasonably safe conditions of confinement and general freedom from undue bodily restraint. *See Youngberg*, 457 U.S. at 315–16, 102 S.Ct. at 2457–58.

■ The Second Circuit has extended the reasoning of *Youngberg* to children who are the responsibility of the state. *See Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1245–46 (2d Cir.1984); *see also Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134, 141 (2d Cir.1981), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Indeed, in the child welfare context, that court has recognized that, "[w]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." *Doe*, 649 F.2d at 141. This Court agrees with the decision of other courts to extend to

---

3. Plaintiffs purport to divide their federal constitutional claims into four categories: "(1) the right to protection from harm while in foster care; (2) the right to conditions and duration of foster care consistent with the purpose of their custody; (3) the right not to be deprived of entitlements created by New York State law without due process; and (4) the right to associate with their biological family members." Plaintiffs' Memorandum of Law in Opposition to Defendants' Partial Motions to Dismiss at 12 [hereinafter "Pls.' Mem. in Opp'n"]. Plaintiffs' brief, however, fails to conform to this outline. Indeed, the contours of plaintiffs' substantive due process claims are vague at best.

After careful consideration, however, this Court concludes that plaintiffs are in fact arguing that they were harmed impermissibly by, among other things, defendants' alleged failure to provide appropriate foster care placements and their failure to preserve plaintiffs' right to family integrity. This Court is of the opinion that the asserted right to be free from harm encompasses the asserted rights to appropriate conditions and duration of placements and to associate with biological family members, and will address those alleged constitutional violations within the broader context of plaintiffs' right to freedom from harm.

children in foster care a substantive due process right to protection from harm. *See, e.g., Norfleet ex rel. Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 291–93 (8th Cir.1993); *Yvonne L. ex rel. Lewis v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 892–93 (10th Cir.1992); *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 849–50 (7th Cir.1990); *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476 (6th Cir.), *cert. denied*, 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990); *Aristotle P. v. Johnson*, 721 F.Supp. 1002, 1008–10 (N.D.Ill.1989).

▮▮ The parties agree that custodial plaintiffs have a constitutional right to be free from harm.[4] The issue facing this Court with respect to custodial plaintiffs, therefore, is not whether they are entitled to protection from harm but, rather, how broad that protection must be. The Supreme Court has held that the right to be free from harm encompasses the right to essentials of care including adequate food, shelter, clothing, and medical attention. *See Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462. Additionally, the state must provide reasonably safe conditions of confinement. *See id.* at 315–16, 102 S.Ct. at 2457–58. Custodial plaintiffs, however, ask this Court to take an expansive view and recognize a substantive due process right to be free not only from physical harm but also from psychological, emotional, and developmental harm. Defendants, on the other hand, urge this Court to take a narrower approach to custodial plaintiffs' substantive due process claims.

The Court is inclined, at this juncture, to take a broad view of the concept of harm in the context of plaintiffs' substantive due process claims. Clearly, the state is required to protect children in its custody from physical injury. This Court further finds that custodial plaintiffs have a substantive due process right to be free from unreasonable and unnecessary intrusions into their emotional well-being. As the United States District Court for the Northern District of Illinois reasoned, "[a] child's physical and emotional

well-being are equally important. Children are by their nature in a developmental phase of their lives and their exposure to traumatic experiences can have an indelible effect upon their emotional and psychological development and cause more lasting damage than many strictly physical injuries." *B.H. v. Johnson*, 715 F.Supp. 1387, 1395 (N.D.Ill. 1989); *see also Aristotle P.*, 721 F.Supp. at 1009–10 (finding that "[t]he fact that the plaintiffs' injuries are psychological rather than physical is of no moment" and that such injuries support substantive due process claim); *Doe v. New York City Dep't of Social Servs.*, 670 F.Supp. 1145, 1175–76 (S.D.N.Y. 1987) (finding that defendants violated plaintiffs' substantive due process rights by subjecting them to physical, emotional, and psychological harm).

a. *Right to Appropriate Conditions and Duration of Foster Care*

As a key element of their substantive due process claims, plaintiffs allege that defendants have violated "their right to be housed in the least restrictive, most appropriate and family-like placement." Complaint at 102. In support of their motions to dismiss, however, defendants argue that custodial plaintiffs do not have a Fourteenth Amendment due process right to the least restrictive, optimal level of care or placement and, therefore, that children who are kept in foster care longer than necessary or who are denied services to enable them to reunite with their families fail to state a claim.

▮▮ Courts generally agree that the Fourteenth Amendment does not require the state to provide children in foster care with an optimal level of care or treatment. *See Baby Neal v. Casey*, 821 F.Supp. 320, 337 (E.D.Pa.1993); *Del A. v. Roemer*, 777 F.Supp. 1297, 1319–20 (E.D.La.1991); *B.H. v. Johnson*, 715 F.Supp. 1387, 1397–98 (N.D.Ill.1989). Thus, to the extent that custodial plaintiffs allege a substantive due process right to a least restrictive, optimal placement, their claims must be dismissed.

---

4. Indeed, City defendants concede that "remaining portions of the First Cause of Action, which allege violations of the Fourteenth Amendment's substantive due process right to freedom from harm while in government custody, are adequately pled as to at least some plaintiffs and are not the subject of this motion." City Defendants' Memorandum of Law at 5 n. 2.

Individuals in state custody, however, do have a constitutional right to conditions of confinement which bear a reasonable relationship to the purpose of their custody. *See Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). Courts have extended this right to the child welfare context. *Doe v. New York City Dep't of Social Servs.,* 670 F.Supp. 1145, 1174 (S.D.N.Y.1987). The goal of the child welfare system is "to further the best interest of children by helping to create nurturing family environments without infringing on parental rights." *Id.* Plaintiffs thus are entitled to conditions and duration of foster care which are reasonably related to this goal. Additionally, as noted above, defendants have an affirmative obligation to provide custodial plaintiffs with adequate food, shelter, clothing, medical care, and reasonable safety. *See DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989).

This Court is satisfied that the right to be free from harm encompasses the right alleged by plaintiffs to appropriate conditions and duration of foster care. Indeed, the crux of plaintiffs' latter claim is that defendants' failure to provide safe and appropriate placements has caused them to suffer impermissible harm. Custodial plaintiffs have alleged sufficient facts to support the claim that they have been deprived of even adequate or appropriate conditions of foster care including certain basic necessities which defendants are obligated to provide. Thus, to the extent that custodial plaintiffs can establish that the conditions and duration of foster care are so inadequate as to violate plaintiffs' Fourteenth Amendment due process right to be free from harm, they are entitled to do so and defendants' motions to dismiss are denied.

### b. *Right to Family Integrity*

Another key element of plaintiffs' substantive due process claims is the allegation that defendants have violated "their right not to be deprived of a family relationship absent compelling reasons." Complaint at 102. While defendants acknowledge the constitutional foundation for the right to family integrity, they argue that this right is not implicated on the facts set forth in the complaint. Specifically, defendants assert that (1) plaintiffs fail to allege that defendants were wrongfully removing children from their biological parents and (2) any alleged failure of defendants to provide services to reunite biological family members does not rise to the level of a constitutional violation.

The right to family integrity is derived both from the First Amendment's broad right of association and the Fourteenth Amendment's general substantive due process protections. *See Roberts v. United States Jaycees,* 468 U.S. 609, 617–20, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978); *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). The Ninth Amendment also has been cited as a source of a right to privacy. *See Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (citing *Griswold v. Connecticut,* 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring)). Although the Supreme Court has held the parent-child relationship to be constitutionally protected, courts nevertheless have been loathe to impose a constitutional obligation on the state to ensure a particular type of family life or to create such an obligation "through the penumbral constitutional ... right to familial privacy." *B.H.,* 715 F.Supp. 1387, 1397 (N.D.Ill.1989); *see also Child v. Beame,* 412 F.Supp. 593, 603 (S.D.N.Y.1976) (holding that plaintiffs could not extrapolate from right to non-interference in private life a right to governmental intervention in form of permanent adoptive placement). In fact, the only courts to apply the concept of family integrity to the child welfare context have done so when children in foster care were denied visitation with siblings and parents. *See Aristotle P. v. Johnson,* 721 F.Supp. 1002 (N.D.Ill.1989); *R.C. ex rel. Alabama Disabilities Advocacy Project v. Hornsby,* No. 88–D–1170–N, slip op. at 10–12 (M.D.Ala. Apr. 19, 1989).

Plaintiffs in the instant case do not allege facts suggesting that they have been

denied such visitation rights but, rather, challenge defendants' general failure to provide services that function to preserve the family unit. Courts have held, however, that plaintiffs "do not have a constitutional right to rely on an agency to strengthen and reunite their families even if that agency has a statutory duty to do so." *Dixey v. Jewish Child Care Assoc.,* 522 F.Supp. 913, 916 (S.D.N.Y.1981) (citing *Child v. Beame,* 412 F.Supp. 593 (S.D.N.Y.1976)). Thus, plaintiffs cannot argue that defendants have violated their right to family integrity and, to the extent that custodial plaintiffs allege a substantive due process right to associate with their biological family members, their claims must be dismissed.

■ Nevertheless, plaintiffs do have a constitutional right to protection from harm as noted above. Plaintiffs' family integrity claims are closely related to those pertaining to the duration of foster care and, by extension, fall within the concept of harm for substantive due process purposes. Indeed, plaintiffs suggest that defendants unnecessarily place children in foster care and allow children properly in foster care to languish without taking steps to reunite them with their biological family where appropriate. Once again, this Court is persuaded that plaintiffs have stated facts sufficient to support a claim that they have been impermissibly harmed in violation of the Fourteenth Amendment by defendants' failure to provide reasonable services and placements that protect custodial plaintiffs' right of association with their biological family members. Custodial plaintiffs, therefore, are entitled to show that defendants' actions or inactions regarding plaintiffs' familial relationships have caused them harm as defined by the Court. Defendants' motions to dismiss this portion of plaintiffs' first cause of action, therefore, are denied.

#### 2. *Procedural Due Process Claims*

Defendants further move to dismiss the second significant component of plaintiffs' first cause of action in which they assert that defendants have deprived plaintiffs of government services to which they have a statutory entitlement without due process of law.

Defendants, without citing to any particular state law provision, contest plaintiffs' procedural due process claims on the grounds that (1) the statutes and regulations upon which plaintiffs rely do not vest in them any constitutionally protected liberty or property interests and (2) even if plaintiffs do have entitlements of which they were deprived, they have failed to allege that they were denied such entitlements without due process of law. Defendants further argue that, not only was process not denied, but plaintiffs fail to assert what process was even due.

Despite bearing the burden of establishing that plaintiffs have failed to state a claim upon which relief can be granted, however, defendants merely set forth established procedural due process doctrine and neglect to analyze why the statutes upon which plaintiffs rely do not create entitlements worthy of constitutional protection. In fact, defendants fail even to refer to any particular statute in their memoranda of law in support of their motions to dismiss. Plaintiffs, however, direct this Court to various provisions of New York's Child Protective Services laws, codified at Title 6 of Article 6 of the New York Social Services Law ("Title 6"). *See* Pls.' Mem. in Opp'n at 31 n. 14. This Court will, therefore, consider whether the provisions of Title 6 create entitlements deserving of constitutional protection. To the extent that defendants move to dismiss plaintiffs' procedural due process claims grounded in any other state law or regulation, the Court is unwilling to entertain defendants' motions without further briefing and such motions are hereby denied.

■ A court analyzing a procedural due process claim first must determine whether plaintiffs have a protected interest and, only then, must decide whether the deprivation of that interest met with the requirements of due process. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). The Supreme Court has held that "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 U.S.

564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). In *Roth*, the Supreme Court explained that "[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709. The Court went on to note that

> [t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits.... To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.* at 576–77, 92 S.Ct. at 2708–09. This Court, therefore, first must determine whether plaintiffs have a legitimate claim of entitlement to the benefits afforded them by Title 6.

The Supreme Court has specifically declined to address whether state child welfare statutes give children an entitlement to protective services "which would enjoy due process protection against state deprivation...." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 n. 2, 109 S.Ct. 998, 1002 n. 2, 103 L.Ed.2d 249 (1989); *see also van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 866 n. 1 (2d Cir.1990). Lower courts faced with this question are divided. *See Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476–77 (6th Cir.) (holding Kentucky child protection statutes give plaintiffs entitlement to protective services of which they may not be deprived without due process of law), *cert. denied*, 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 798–800 (11th Cir.1987) (holding children in foster care can state claim based upon deprivation of liberty interest when officials fail to follow guidelines mandated by Georgia foster care and placement scheme), *cert. denied*, 489 U.S. 1065,

109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Powell v. Dep't of Human Resources of the State of Ga.*, 918 F.Supp. 1575, 1580–82 (S.D.Ga. 1996) (holding comprehensive and mandatory nature of Georgia Child Abuse Protocol vests abused children with constitutionally protected entitlement to procedures and protections mandated therein); *Eric L. ex rel. Schierberl v. Bird*, 848 F.Supp. 303, 308 (D.N.H.1994) (refusing to dismiss plaintiffs' claims that New Hampshire child protection statute creates entitlement to certain services); *Baby Neal v. Casey*, 821 F.Supp. 320, 338–39 (E.D.Pa.1993) (denying summary judgment on plaintiffs' procedural due process claims); *Chrissy F. ex rel. Medley v. Mississippi Dep't of Pub. Welfare*, 780 F.Supp. 1104, 1127–29 (S.D.Miss.1991) (holding provisions of Youth Court law at issue created property interests enforceable under the due process clause), *aff'd in part, rev'd in part*, 995 F.2d 595 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1336, 127 L.Ed.2d 684 (1994). *But see Tony L. ex rel. Simpson v. Childers*, 71 F.3d 1182, 1186–87 (6th Cir.1995) (holding Kentucky child protection statutes do not give rise to state-created due process liberty interest), *cert. denied*, —— U.S. ——, 116 S.Ct. 1834, 134 L.Ed.2d 938 (1996); *Doe ex rel. Nelson v. Milwaukee County*, 903 F.2d 499, 502–05 (7th Cir.1990) (holding Wisconsin child abuse reporting statute does not vest plaintiffs with constitutionally-protected property interest); *Coker ex rel. Coker v. Henry*, 813 F.Supp. 567, 569–70 (W.D.Mich. 1993) (holding Michigan child protection law not sufficiently explicit and mandatory to create claim of entitlement to protective services), *aff'd*, 25 F.3d 1047 (6th Cir.1994); *B.H. v. Johnson*, 715 F.Supp. 1387, 1399–1400 (N.D.Ill.1989) (holding plaintiffs have no constitutionally protected liberty or property interest in Illinois Abuse and Neglected Child Reporting Act); *Child v. Beame*, 412 F.Supp. 593, 604–05 (S.D.N.Y.1976) (holding plaintiffs have no constitutionally protected property interest in permanent adoptive placement); *see also Colson ex rel. Colson v. Sillman*, 35 F.3d 106, 109 (2d Cir.1994) (holding applicants for benefits under county's physically handicapped children's program

lack claim of entitlement and thus have no due process property interest).

The Second Circuit has addressed whether a state law creates a claim of entitlement under *Roth* in the context of benefits afforded to applicants under a county's physically handicapped children's program. *See Colson*, 35 F.3d at 108. In *Colson*, plaintiffs relied upon a specific provision of New York's Public Health Law that vests substantial, if not total, discretion in the State and the State's Department of Health both to appropriate funds for medical services and to provide such services.[5] The court held that "[w]hether the benefit invests the applicant with a 'claim of entitlement' or merely a 'unilateral expectation' is determined by the amount of discretion the disbursing agency retains." *Id.; see also Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 581 (2d Cir. 1989) (noting that "the existence of provisions that retain for the state significant discretionary authority over the bestowal or continuation of a government benefit suggests that the recipients of such benefits have no entitlement to them"). The *Colson* court reversed the district court's grant of summary judgment in plaintiffs' favor on the ground that, because the provision at issue vests virtually total discretion in the State and the State's Department of Health, "applicants [did] not possess a 'claim of entitlement' running against the State." *Colson*, 35 F.3d at 110. To determine whether Title 6 creates a legitimate claim of entitlement, therefore, this Court must determine whether the provisions of Title 6 vest significant discretion in the agency or, rather, are mandatory.

▮ Title 6 sets forth a specific scheme for child protection the purpose of which is to encourage more complete reporting of suspected child abuse and maltreatment and to establish in each county of the state a child protective service capable of investigating such reports swiftly and competently and capable of providing protection for the child or children from further abuse or maltreatment and rehabilitative services for the child or children and parents involved.

SSL § 411. These child welfare laws, like others that have been found to create entitlements, "mandate that officials follow guidelines and take affirmative actions to ensure the well being and promote the welfare of children in foster care." *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 799 (11th Cir.1987), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989). Indeed, the significant provisions of Title 6 are mandatory in nature and, for example, (1) provide that certain individuals "are required to report or cause a report to be made ... when they have reasonable cause to suspect that a child ... is an abused or maltreated child," SSL § 413; (2) demand that "[r]eports of suspected child abuse or maltreatment ... shall be made immediately" pursuant to a detailed reporting procedure, SSL § 415; (3) set forth the obligations of persons required to report cases of suspected child abuse and maltreatment, SSL § 416; (4) set forth circumstances under which an individual "shall take all appropriate measures to protect a child's life and health including, when appropriate, taking or keeping a child in protective custody," SSL § 417; (5) set forth the mandatory penalties for the failure of an obligated person to report a case of suspected child abuse and maltreatment, SSL § 420; (6) establish that "[t]he department shall ... conduct a continuing publicity and education program ... provide technical assistance to local social services departments ... issue guidelines to assist local social services departments in evaluating and establishing investigative priorities ... [and] promulgate [specific] regulations," SSL § 421; (7) require that "[t]here shall be established ... a statewide central register of child abuse and maltreatment reports" and set forth its required capabilities, SSL § 422; (8) mandate that "[e]very local department of social services shall establish a 'child protective service' within such department" and set forth its required functions, SSL § 423; (9) delineate the specific and mandatory duties

---

5. The provision reads: "The department shall on its own initiative provide, within the limits of the appropriations made therefor, such medical service for children with physical disabilities as in the judgment of the commissioner is needed." Public Health Law § 2582(1).

of each child protective service concerning reports of abuse or maltreatment, SSL § 424; and (10) set forth the duties of the commissioner with respect to custodial children, SSL §§ 424–b and –c.

Each relevant provision of Title 6 contains the mandatory language necessary to elevate the benefit to an entitlement. Title 6 is distinguishable from the law relied upon by the plaintiffs in *Colson* which, according to that court, contains "virtually nothing that is mandatory" and places the decision to act in the near total discretion of the commissioner. *Colson*, 35 F.3d at 109. That Title 6 requires the agency or obligated individuals to act upon reasonable cause to suspect that a child is being abused or maltreated and to take appropriate measures rather than specific steps in every potential situation does not alter the mandatory nature of the scheme. Indeed, to the extent that certain provisions confer some discretion upon the agency or obligated individuals, such discretion is a necessary by-product of a statutory scheme such as this one. The Court finds, therefore, that New York's Child Protective Services laws are more than mere procedural guidelines and, in fact, give plaintiffs an entitlement to protective services of which they may not be deprived without due process of law.

 An entitlement to child protective services thus having been established, the Court is unwilling at this juncture to dismiss plaintiffs' procedural due process claims. As Justice Blackmun has noted, "[i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest ... is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (citing *Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981)). Whether, as defendants argue, state law affords plaintiffs a mandatory review procedure which would satisfy due process and whether plaintiffs have been deprived of that process are matters better left for trial. Despite having reservations regarding the merits of plaintiffs' procedural due process claims, the Court nevertheless holds that defendants

have not met their burden of showing that plaintiffs have failed to state a claim upon which relief can be granted and defendants' motions to dismiss this portion of plaintiffs' first cause of action are hereby denied.

### B. *Plaintiffs' Federal Statutory Claims*

 42 U.S.C. § 1983 provides a remedy for violations of both federal constitutional and statutory rights. *See Golden State Transit Corp. v. City of L.A.*, 493 U.S. 103, 105, 110 S.Ct. 444, 447, 107 L.Ed.2d 420 (1989); *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). While courts have broadly construed § 1983 as a vehicle for pursuing constitutional claims, the Supreme Court has more narrowly applied § 1983 to alleged statutory violations. Plaintiffs may rely on § 1983 to seek redress for an alleged violation of a federal statute except "where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983." *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987); *see also Suter v. Artist M.*, 503 U.S. 347, 355, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992); *Wilder v. Virginia Hosp. Assoc.*, 496 U.S. 498, 508, 110 S.Ct. 2510, 2516, 110 L.Ed.2d 455 (1990). In their complaint, plaintiffs have alleged violations of the Adoption Assistance Act, including the provision herein referred to as the Multiethnic Placement Act, CAPTA, the ADA, and the Rehabilitation Act. Defendants ask this Court to dismiss virtually all of those federal statutory claims.

#### 1. *Claims Pursuant to the Social Security Act*

Defendants ask the Court to dismiss plaintiffs' second, third, and fifth causes of action brought pursuant to various provisions of the Social Security Act ("SSA") including the Adoption Assistance Act, the Multiethnic Placement Act, and CAPTA on the ground that these provisions do not provide for a private right of action to enforce their requirements. Defendants do not argue that plaintiffs fail to state violations of these pro-

visions but, rather, move to dismiss on the basis that plaintiffs are not entitled to pursue these claims in federal court.

▮ When deciding whether a private right of action exists to enforce a federal funding statute, courts are bound by any expression of clear intent on the part of Congress to create such a right. *See Mrs. W. v. Tirozzi,* 832 F.2d 748, 754–55 (2d Cir. 1987). Where no unambiguous statement of intent exists, courts must determine if the statute creates enforceable rights, privileges, or immunities. *See Wilder v. Virginia Hosp. Assoc.,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2516, 110 L.Ed.2d 455 (1990); *Wright v. City of Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987); *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 15, 101 S.Ct. 1531, 1538, 67 L.Ed.2d 694 (1981). In *Wilder,* the Supreme Court set forth three factors for courts to consider: (1) whether " 'the provision in question was intend[ed] to benefit the putative plaintiff' "; (2) whether the provision "reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit"; and (3) whether "the interest the plaintiff asserts is 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.' " *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517 (citations omitted).

▮ Once these three factors have been met, the burden shifts to the state actor to show Congressional intent to the contrary. *See Wright,* 479 U.S. at 423–24, 107 S.Ct. at 770. Generally, "§ 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Id.* at 423, 107 S.Ct. at 770. This requires defendants to show that Congress provided "a comprehensive enforcement mechanism for the protection of the federal right" with which plaintiffs' § 1983 action would be inconsistent. *Harris v.*

*James,* 883 F.Supp. 1511, 1518 (M.D.Ala. 1995). A showing of the availability of administrative protection is insufficient to meet this burden. *See id.* The Supreme Court has warned that courts should " 'not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federally secured right." *Wright,* 479 U.S. at 423–24, 107 S.Ct. at 770 (citation omitted).

#### a. The Adoption Assistance Act Claims

▮ The Adoption Assistance Act is contained in subchapter IV of the SSA and establishes a cooperative federal-state program under which the federal government provides funding for child welfare programs to participating states. Plaintiffs allege violations of 42 U.S.C. §§ 622(b) and 627(a) and (b) of subchapter IV–B entitled "Child Welfare Services" [6] and of 42 U.S.C. § 671(a) of subchapter IV–E entitled "Federal Payments for Foster Care and Adoption Assistance." [7]

Whether a private right exists to enforce provisions of the Adoption Assistance Act has been the subject of recent debate in both the judicial and legislative branches of government. In 1992, the Supreme Court considered whether a private individual could bring a § 1983 claim to enforce § 671(a)(15) of the Adoption Assistance Act. *See Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). The Court asked whether "Congress, in enacting the Adoption Act, unambiguously confer[red] upon the child beneficiaries of the Act a right to enforce the requirement that the State make 'reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family." *Id.* at 357, 112 S.Ct. at 1367. Departing from earlier precedent, the Court held that § 671(a)(15) was too vague and amorphous to provide a cause of action under § 1983 and that Congress did not intend "to create the private remedy sought by plaintiffs." *Id.* at 364, 112 S.Ct. at 1370. In the following years, several other courts applied *Suter* to find that no private right of action exists to enforce this

---

6. Specifically, plaintiffs allege violations of 42 U.S.C. §§ 622(b)(9), 627(a)(2)(A), 627(a)(2)(C), and 627(b)(3).

7. Specifically, plaintiffs allege violations of 42 U.S.C. §§ 671(a)(10) and 671(a)(16).

statute. *See, e.g., Eric L. ex rel. Schierberl v. Bird,* 848 F.Supp. 303, 311–12 (D.N.H. 1994); *Baby Neal v. Casey,* 821 F.Supp. 320, 324–28 (E.D.Pa.1993). Defendants rely on this line of cases in support of their motions to dismiss.

In 1994, however, Congress expressed its disapproval of the Supreme Court's decision in *Suter* and amended the SSA. *See* 42 U.S.C. § 1320a–2 (Oct. 20, 1994) [hereinafter "Amendment"]. The Amendment states:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.,* [503 U.S. 347] 112 S.Ct. 1360 [118 L.Ed.2d 1] (1992) [sic], but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

*Id.* Plaintiffs argue that this Amendment is a clear expression of Congress' intent to create a private right of action to enforce provisions of the Adoption Assistance Act other than § 671(a)(15). In the alternative, plaintiffs argue that the Amendment shows Congress' intent to reject the Supreme Court's reasoning in *Suter* and to require courts to return to the pre-*Suter* approach when deciding whether to recognize a private right of action to enforce provisions other than § 671(a)(15). Defendants, however, stand by their reading of the import of *Suter.* They argue that not only did Congress preclude any private right to enforce § 671(a)(15) but also that it left open to judicial construction whether plaintiffs can rely on § 1983 to enforce the other provisions of the Adoption Assistance Act. Defen-

dants urge this Court to apply the reasoning in *Suter* to plaintiffs' claims.

This Court does not read the Amendment as a clear expression of Congress' intent to create a private right of enforcement. Rather, this Court is persuaded that Congress has expressed its intent to require courts to apply pre-*Suter* case law to determine the private enforceability of SSA provisions other than § 671(a)(15).[8] Courts that recently have considered this issue have adopted this approach. *See Harris v. James,* 883 F.Supp. 1511, 1520 (M.D.Ala.1995); *Jeanine B. ex rel. Blondis v. Thompson,* 877 F.Supp. 1268, 1285 (E.D.Wis.1995). Accordingly, only the narrow holding in *Suter* remains and this Court "must 'rewind the clock' and look to cases prior to *Suter* to determine the enforceability" of the provisions at issue in the instant case. *Jeanine B.,* 877 F.Supp. at 1283. As noted by the court in *Jeanine B.,*

> the amendment overrules the general theory in Suter that the only private right of action available under a statute requiring a state plan is an action against the state for not having that plan. Instead, the previous tests of Wilder and Pennhurst apply to the question of whether or not the particulars of a state plan can be enforced by its intended beneficiaries.

*Id.* The Court must now apply the factors set forth in *Wilder* to decide whether plaintiffs are entitled to pursue their claims under § 1983.

Plaintiffs allege violations of § 622(b)(9) and of §§ 627(a) and (b) of subchapter IV–B of the SSA. The Multiethnic Placement Act, § 622(b)(9), sets forth as part of the requirements for federal funding that a state plan for child welfare services "provide for the diligent recruitment" of potential foster and adoptive parents who are racially and ethnically diverse. Of the other provisions relied upon by plaintiffs, § 627(a) describes the foster care protections that the state must offer in order to gain additional payments and § 627(b) outlines the further requirements the state must meet to avoid a reduction of its allotment. With respect to the first *Wil-*

---

**8.** It is undisputed that the Amendment reaffirms the Supreme Court's decision in *Suter* that no private right exists to enforce § 671(a)(15) and

plaintiffs do not allege violations of that provision.

der factor, both §§ 622 and 627 are intended to benefit the members of the proposed class of plaintiffs. Further, the language of these provisions is mandatory and sets forth the requirements that the state must meet to be eligible for funding, to gain additional funding, and to avoid a reduction in funding. The second *Wilder* factor thus is met. Finally, determining state compliance with these provisions is well within the abilities of the Court. None of these provisions is so vague or amorphous as to be beyond the competence of the Court to enforce.

Plaintiffs also allege violations of § 671(a) of subchapter IV–E of the SSA. That provision sets forth the requisite elements and features a state plan for foster care and adoption assistance must contain in order for the state to be eligible for federal funding. With respect to the first *Wilder* factor, it is clear that the members of the proposed class of plaintiffs are the intended beneficiaries of the Adoption Assistance Act. Second, the language of § 671(a) is mandatory and "impose[s] a binding obligation by explicitly tying the creation of certain features of a state plan to federal funding." *Jeanine B.*, 877 F.Supp. at 1283. Finally, none of the subsections of § 671(a) relied upon by plaintiffs is so vague or amorphous as to make judicial enforcement impossible. Both §§ 671(a)(10) and (a)(16) are clear and are not beyond the power of the Court to enforce.

Prior to *Suter*, several courts recognized the right of private individuals to sue for violations of provisions of the Social Security Act. *See, e.g., Winston ex rel. Winston v. Children and Youth Servs. of Delaware County*, 948 F.2d 1380, 1388 (3d Cir.1991), *cert. denied*, 504 U.S. 956, 112 S.Ct. 2303, 119 L.Ed.2d 225 (1992); *Timmy S. v. Stumbo*, 916 F.2d 312, 315 (6th Cir.1990); *L.J. ex rel. Darr v. Massinga*, 838 F.2d 118, 123 (4th Cir.1988), *cert. denied*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989); *Lynch v. Dukakis*, 719 F.2d 504, 510–12 (1st Cir.1983). Additionally, this Court finds no evidence that Congress has indicated its intent to preclude private plaintiffs from seeking to enforce provisions of the Adoption Assistance Act other than § 671(a)(15). For the foregoing reasons, defendants' motions to dismiss plaintiffs' claims pursuant to provisions of the Adoption Assistance Act are hereby denied.

### b. *CAPTA Claims*

Plaintiffs further allege violations of two provisions of CAPTA which govern federal grants to states for child abuse and neglect prevention and treatment programs. The first, 42 U.S.C. § 5106a(b)(2), requires a state, as a condition of federal funding, to initiate a prompt investigation into all reports of abuse or neglect and to take immediate steps to protect children whom the state believes have suffered or are at risk of suffering abuse or neglect. The second, 42 U.S.C. § 5106a(b)(3), requires a state to have in effect administrative procedures, personnel, training procedures, facilities, and related programs and services "to ensure that the State will deal effectively with child abuse and neglect cases" in order to be eligible for federal funds.

Defendants again ask this Court to dismiss these claims on the ground that plaintiffs have no private right of action to enforce these statutes. Courts have differed in their interpretation of whether CAPTA creates rights enforceable by private individuals pursuant to § 1983. *See Jeanine B. ex rel. Blondis v. Thompson*, 877 F.Supp. 1268 (E.D.Wis.1995) (allowing plaintiffs to pursue CAPTA claims). *But see Tony L. ex rel. Simpson v. Childers*, 71 F.3d 1182 (6th Cir. 1995) (holding no private right of enforcement of CAPTA), *cert. denied*, —— U.S. ——, 116 S.Ct. 1834, 134 L.Ed.2d 938 (1996); *Eric L. ex rel. Schierberl v. Bird*, 848 F.Supp. 303 (D.N.H.1994) (dismissing plaintiffs' CAPTA claims); *Baby Neal v. Casey*, 821 F.Supp. 320 (E.D.Pa.1993) (holding no private right of enforcement of CAPTA). Plaintiffs do not argue, as they did with respect to the Adoption Assistance Act, that there exists a well-established private right to enforce CAPTA. At the same time, defendants do not argue that Congress has expressed its intent to preclude private enforcement of the statute. Rather, the parties expect this Court to undertake a traditional *Wilder* analysis to de-

684

termine whether plaintiffs are entitled to pursue these claims.

As to the first prong of *Wilder*, there is no dispute that the members of the proposed class of plaintiffs are the intended beneficiaries of the CAPTA provisions at issue. Moving to the second inquiry, the language of §§ 5106a(b)(2) and (b)(3) requires that "such State shall ... provide that ... an investigation shall be initiated promptly ... and ... immediate steps shall be taken to protect the health and welfare of the ... child...." The statute sets forth clear conditions which the state must meet to qualify for a federal grant and does so through the use of mandatory and not precatory language. The sole area of contention is whether these CAPTA provisions meet the third *Wilder* prong or whether they are so vague and amorphous as to be beyond the enforcement power of the Court. Two of the courts to consider most recently the private enforceability of CAPTA grappled primarily with this issue. *See Tony L.*, 71 F.3d at 1189–90; *Jeanine B.*, 877 F.Supp. at 1286.

Defendants argue that the language in § 5106a(b)(2) requiring the state to conduct prompt investigations and to take immediate steps to protect children at risk is too ambiguous and that the Court, therefore, is not qualified to assess compliance. To the contrary, this Court certainly is competent to determine whether the state has made any efforts to comply with this provision. Further, the Court can look to professional standards to determine whether an investigation was properly and promptly initiated and whether the protective steps taken were appropriate. This provision, therefore, is not so vague as to be beyond the enforcement power of the Court. With respect to § 5106a(b)(3), defendants do not cite any language from this provision as being too ambiguous to be enforced judicially. Accordingly, § 5106a(b)(3) likewise survives the third prong of *Wilder*. Finally, defendants have not argued that Congress has precluded expressly private plaintiffs from pursuing § 1983 claims alleging violations of CAPTA.

In light of the 1994 Amendment disapproving of the Supreme Court's reasoning in *Suter* and the more recent decision of the United States District Court for the Eastern District of Wisconsin in *Jeanine B.*, this Court is persuaded that plaintiffs are entitled to claim alleged violations of CAPTA pursuant to § 1983. In so doing, the Court has considered and now rejects the notion that the discretionary nature of the regulation renders CAPTA too vague for the court to enforce. Defendants' motions to dismiss plaintiffs' claims pursuant to provisions of CAPTA are, therefore, denied.

2. *Claims Pursuant to the Disability Statutes*

Defendants ask the Court to dismiss plaintiffs' sixth cause of action brought pursuant to the ADA and the Rehabilitation Act for failure to allege facts sufficient to state violations of these statutes. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act provides in pertinent part:

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a). Although both statutes establish similar rights, the ADA affords plaintiffs broader protection in that it prohibits discrimination by state agencies regardless of whether they receive federal funding.

It is defendants' position that plaintiffs fail to state a claim under these statutes because they do not allege facts sufficient to show that they were denied both the opportunity to participate in foster care services and the benefits available to non-disabled persons on account of their disabilities. Plaintiffs argue that defendants have violated these Acts by failing to make reasonable accommodations for handicapped children, including appropriate placements and proper medical attention to allow them to function while in foster care, such that they are deprived of meaningful access to the child welfare system.

It is well established that the ADA and the Rehabilitation Act require public entities or those entities receiving federal funds to provide reasonable accommodations for the handicapped. *See Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985). Although no court has addressed directly the type of accommodation sought here, the Second Circuit has held that the Rehabilitation Act, which is narrower in scope than the ADA, requires defendants to take " 'modest affirmative steps' to accommodate the handicapped" in the context of public transportation. *Dopico v. Goldschmidt,* 687 F.2d 644, 652 (2d Cir.1982); *see also Leary v. Crapsey,* 566 F.2d 863, 865 (2d Cir.1977); *Rothschild v. Grottenthaler,* 716 F.Supp. 796, 800 (S.D.N.Y.1989). Other federal courts have interpreted the ADA and the Rehabilitation Act to require reasonable accommodations. *See, e.g., Tyler v. City of Manhattan,* 849 F.Supp. 1429, 1439 (D.Kan. 1994) (refusing to grant defendant's motion for summary judgment on plaintiff's ADA claim based on his exclusion from City Commission meeting due to lack of wheelchair accessibility); *Concerned Parents to Save Dreher Park Ctr. v. City of W. Palm Beach,* 846 F.Supp. 986, 992 (S.D.Fla.1994) (granting plaintiffs' motion for preliminary injunction requiring defendant to take steps to afford benefits of City's recreational program to persons with disabilities); *Noland v. Wheatley,* 835 F.Supp. 476, 483 (N.D.Ind.1993) (denying defendants' motion to dismiss plaintiff's ADA claim based on prison's failure to provide basic accommodation to semi-quadriplegic prisoner).

Taken together, these cases stand for the proposition that a disabled individual is entitled to meaningful access to the benefits and services provided by a public agency or an agency receiving federal funds. Access alone, despite defendants' arguments to the contrary, is insufficient. *See Alexander,* 469 U.S. at 301, 105 S.Ct. at 720. Rather, a court may require an agency, under certain circumstances, to take affirmative steps to ensure that the access is meaningful. *See id.; Dopico,* 687 F.2d at 652. At issue here is whether plaintiffs allege sufficient facts which, if proven, support a claim that defendants failed to take these "modest affirmative steps" such that plaintiffs were deprived of meaningful access to the child welfare system.

With respect to named plaintiff Lawrence B., who recently died of AIDS-related illness, the agency's failure to provide meaningful access to child welfare services is evident. As an initial matter, it is undisputed that Lawrence was disabled as defined by the ADA and the Rehabilitation Act. CWA failed to assess promptly Lawrence's medical status, transferred him from one inappropriate placement to another including a group home that lacked the medical staff needed to monitor his condition, neglected to inform the placement agency of his HIV-positive status, placed him in a group home aimed to assist teenagers in making the transition to independent living, and maintained a goal of independent living in his case plan until his death. The facts alleged by another named plaintiff, Ozzie E., who remains in a group home unequipped to address his neurological problems, further support plaintiffs' claims under the ADA and the Rehabilitation Act.

Plaintiffs' allegations, if proven, raise serious questions as to whether ACS has fulfilled even its most fundamental obligation to provide meaningful access as required by the ADA and the Rehabilitation Act. This Court, taking the allegations of the complaint as true for purposes of the instant motion, holds that plaintiffs have alleged sufficient facts to support their claims. Accordingly, defendants' motions to dismiss plaintiffs' claims brought under the ADA and the Rehabilitation Act are hereby denied.

### C. *Plaintiffs' State Law Claims*

Defendants move to dismiss plaintiffs' seventh and eighth causes of action alleging violations of the New York State Constitution and various state laws and regulations. To that end, defendants ask the Court to refuse to exercise supplemental jurisdiction or to dismiss plaintiffs' state law claims for lack of justiciability. In the alternative, defendants ask the Court to abstain from deciding plaintiffs' claims, the City relying on the *Burford* abstention doctrine and the State relying on the *Younger* abstention doctrine.

### 1. *Supplemental Jurisdiction*

 Federal courts have the power pursuant to 28 U.S.C. § 1367 to exercise supplemental jurisdiction over state law claims that arise from events that form the basis of alleged violations of federal law. That statute provides, in pertinent part:

(a) Except as provided in subsections (b) and (c) ... in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367. Subsection (c) of § 1367 sets forth the conditions under which a district court may decline to exercise supplemental jurisdiction over a state law claim. Defendants urge this Court to decline to exercise such jurisdiction pursuant to § 1367(c)(2) which grants a court the discretion to decline jurisdiction if "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction."

As a threshold matter, it is undisputed that plaintiffs' state law claims are so related to their federal claims as to form part of the same case or controversy as required by § 1367(a). Indeed, defendants do not contest that this Court has the discretion to consider plaintiffs' allegations but, rather, ask this Court to decline to do so. Because the bulk, if not all, of plaintiffs' federal claims have survived defendants' motions to dismiss, plaintiffs' state law claims cannot be said to predominate for purposes of § 1367(c)(2). Even if this were not so, however, § 1367(c) merely sets forth circumstances under which a district court may, but is not required to, decline to exercise jurisdiction. For the foregoing reasons, supplemental jurisdiction is proper and this Court hereby exercises that jurisdiction over plaintiffs' state law claims.

### 2. *Justiciability*

 Jurisdiction having been established, this Court must now determine the justicia-

bility of plaintiffs' state law claims. Defendants argue that plaintiffs' state law claims are non-justiciable in that they require the Court to usurp the role of the State Department of Social Services ("DSS") which, by statute, is responsible for enforcing state laws and regulations. A court determining the justiciability of a claim must consider the doctrine of separation of powers and must recognize that the court may be ill-suited to certain administrative tasks. *See Jones v. Beame,* 45 N.Y.2d 402, 408–09, 408 N.Y.S.2d 449, 380 N.E.2d 277 (N.Y.Ct.App.1978). Defendants suggest that this Court should decline to consider plaintiffs' state law claims because to do so would "embroil the court[ ] in the administration of programs the primary responsibility for which lies in the executive branch of government." *Id.* at 406, 408 N.Y.S.2d 449, 380 N.E.2d 277.

 This Court is persuaded by plaintiffs' argument that the judicial branch is competent to determine whether ACS has complied with the duties imposed upon it by the state legislature. In an analogous context, the New York Court of Appeals addressed the justiciability of state law claims brought by a group of present and former psychiatric patients seeking to enforce their statutory rights and noted that "there is nothing inherent in plaintiffs' attempts to seek a declaration and enforcement of their rights that renders the controversy nonjusticiable. They do not wish to controvert the wisdom of any program. Instead, they ask only that the program be effected in the manner that it was legislated." *Klostermann v. Cuomo,* 61 N.Y.2d 525, 537, 475 N.Y.S.2d 247, 463 N.E.2d 588 (N.Y.Ct.App. 1984). As that court noted, "it is within the court's competence to ascertain whether an administrative agency has satisfied the duty that has been imposed on it by the Legislature and, if it has not, to direct that the agency proceed forthwith to do so." *Id.* at 531, 475 N.Y.S.2d 247, 463 N.E.2d 588.

As in *Klostermann,* plaintiffs ask this Court to adjudicate their legal claims and to ensure the enforcement of their statutory rights. These actions fall well within the power of the judicial branch in that they do

not require this Court to preempt the discretionary authority vested in the executive branch and, thus, do not raise the separation of powers concerns suggested by defendants. Additionally, New York courts have deemed justiciable similar claims of systemic state law violations. *See, e.g., Jiggetts v. Grinker,* 75 N.Y.2d 411, 415–16, 554 N.Y.S.2d 92, 553 N.E.2d 570 (N.Y.Ct.App.1990) (holding that plaintiffs' claim presents justiciable controversy involving alleged failure of state commissioner of social services to comply with provision of social services law); *McCain v. Koch,* 70 N.Y.2d 109, 119–20, 517 N.Y.S.2d 918, 511 N.E.2d 62 (N.Y.Ct.App.1987) (holding that court had power to issue temporary injunction requiring state agency which provides emergency housing to homeless families with children to meet minimum standards); *Martin A. v. Gross,* 153 A.D.2d 812, 815–17, 546 N.Y.S.2d 75 (1st Dep't 1989) (affirming order directing defendants to comply with Child Welfare Reform Act). Following the court's reasoning in *Klostermann,* this Court holds that plaintiffs' state law claims are justiciable.

### 3. *Abstention*

██ Finally, in further support of their motions to dismiss, defendants ask this Court to refrain from considering plaintiffs' claims. City defendants rely on the *Burford* abstention doctrine and urge the Court not to consider plaintiffs' claims brought pursuant to the New York State Constitution, statutes, and regulations. The State defendants, however, argue for a broader abstention based on the *Younger* doctrine. In either case, abstention is a doctrine to be applied only in rare and exceptional cases and, as a general rule, federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976).

### a. *Burford Abstention*

██ Under the Supreme Court's ruling in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), a federal court should abstain from deciding a state law claim where to do so would interfere with " 'the rightful independence of state governments in carrying out their domestic policy.' " *Id.* at 318, 63 S.Ct. at 1099. The Supreme Court has held that abstention under *Burford* is proper where there have been presented difficult questions of state law bearing on problems of substantial public import whose importance transcends the result in the case at bar. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1975) (citing *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959)). *Burford* abstention thus is appropriate where the "exercise of federal review ... would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Id.* The Second Circuit has held that abstention is appropriate only when two factors, unclear state law and broad impact on state policy, are present. *See Smith v. Metropolitan Property & Liab. Ins. Co.,* 629 F.2d 757, 760 (2d Cir. 1980); *see also Canaday v. Koch,* 608 F.Supp. 1460, 1468 (S.D.N.Y.) (holding unclear state law, while alone insufficient reason for abstention, is compelling factor in favor of abstention when issues pertain to matters of predominantly local concern), *aff'd,* 768 F.2d 501 (2d Cir.1985).

██ City defendants contend that *Burford* abstention is appropriate in the instant case for three reasons: (1) a federal ruling could conflict with the state's administrative scheme; (2) the laws upon which plaintiffs rely are unclear; and (3) the area of child welfare services is one of substantial state concern. This Court is not persuaded by any of defendants' arguments. As an initial matter, plaintiffs neither ask the Court to make individualized findings of fact on plaintiffs' allegations nor to interfere with or alter the underlying policies of ACS. Rather, plaintiffs ask this Court to fashion relief to ensure agency compliance with an existing administrative and statutory scheme. Further, it is not at all apparent that the laws upon which plaintiffs rely are unclear. Rather, this Court is competent to determine whether ACS has complied with the state constitu-

tional provisions, statutes, and regulations governing the child welfare system.

The most compelling of defendants' arguments, that the area of child welfare is of substantial state concern, likewise is without merit. The *Burford* abstention doctrine is intended "to preserve federal-state comity by not interfering with state attempts to develop, effect and/or enforce state policy." *Canaday,* 608 F.Supp. at 1468–69. Although any ruling of this Court would undoubtedly have an effect on state affairs, plaintiffs do not ask this Court to rule on policy matters but, as noted above, to determine defendants' compliance ·with established state law. There is, therefore, nothing to suggest that the decision of this Court to adjudicate plaintiffs' state law claims would be "inimical to harmonious federalism." *Smith,* 629 F.2d at 759.

### b. *Younger Abstention*

 State defendants ask this Court to abstain from adjudicating plaintiffs' claims pursuant to the doctrine set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Originally a bar to federal interference in state criminal proceedings, the Supreme Court has expanded *Younger*'s application to civil proceedings and has interpreted *Younger* to counsel federal courts "to abstain from jurisdiction whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests." *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 237, 104 S.Ct. 2321, 2328, 81 L.Ed.2d 186 (1984); *see also Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). Accordingly, *Younger* abstention "is warranted when there is an ongoing state proceeding involving an important state interest that provides the federal plaintiff with an adequate opportunity for judicial review of its federal ... claims." *Temple of Lost Sheep, Inc. v. Abrams,* 930 F.2d 178, 182 (2d Cir.), *cert. denied,* 502 U.S. 866, 112 S.Ct. 193, 116 L.Ed.2d 153 (1991). This doctrine is premised on the notions of

comity and separation of powers to which Justice Black has given the name "Our Federalism." *Younger,* 401 U.S. at 44–45, 91 S.Ct. at 750–751.

 Courts deciding whether to abstain pursuant to *Younger* must consider whether (1) there is an ongoing state judicial proceeding; (2) those proceedings implicate important state interests; and (3) there exists an adequate opportunity in state proceedings to raise federal claims. *See Middlesex County Ethics Comm. v. Garden State Bar Assoc.,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1983). The existence of an ongoing state court proceeding is crucial to this inquiry. The Supreme Court has explicitly stated that "we have never applied the notions of comity so crucial to Younger's 'Our Federalism' when no state proceeding was pending...." *Ankenbrandt v. Richards,* 504 U.S. 689, 705, 112 S.Ct. 2206, 2216, 119 L.Ed.2d 468 (1992). Further, the court held that "[a]bsent any pending proceeding in state tribunals ... application by the lower courts of Younger abstention was clearly erroneous." *Id.* Indeed, plaintiffs in child welfare cases where courts have abstained under *Younger* have all been enmeshed in state court proceedings and have attempted to use the federal courts to attack collaterally state court rulings. *See, e.g., Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Thomas v. Beth Israel Hospital, Inc.,* 710 F.Supp. 935, 943 (S.D.N.Y.1989); *Donkor v. City of New York Human Resources Admin. Special Servs. for Children,* 673 F.Supp. 1221, 1224–25 (S.D.N.Y.1987). Notably, several courts have explicitly rejected *Younger* abstention in cases involving child welfare systems. *See, e.g., LaShawn A. ex rel. Moore v. Kelly,* 990 F.2d 1319, 1323 (D.C.Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 659 (1994), *appeal after remand,* 69 F.3d 556 (D.C.Cir.1995), *judgment vacated and rehearing en banc granted,* 74 F.3d 303 (D.C.Cir.1996); *Baby Neal v. Casey,* 821 F.Supp. 320, 332 (E.D.Pa.1993); *Wilder v. Bernstein,* 645 F.Supp. 1292, 1339 n. 37 (S.D.N.Y.1986), *aff'd,* 848 F.2d 1338 (2d Cir.1988).

 State defendants do not refer this Court to any pending state proceeding in

which plaintiffs will have the opportunity to present the federal claims raised in the instant complaint. Rather, defendants summarily argue for abstention on the grounds that

> since New York's statutory scheme under the Family Court Act embodies the mandates of [the Adoption Assistance Act] and CAPTA, etc., the issues of compliance by the State with those statutes are cognizable in New York's Family Court. By definition, every child who is subject to New York's child protective system is also subject to a Family Court action in which the claims raised here can be litigated.

State Defendants' Reply Memorandum of Law in Support of Motion to Dismiss the Complaint at 8. Because none of the plaintiffs in the instant case are improperly challenging a state court proceeding through the federal courts, the *Younger* abstention doctrine is inapplicable to the instant case.

## II. *Motion for Class Certification*

■ Plaintiffs have moved pursuant to Rule 23, Fed.R.Civ.P., for an order certifying this action as a class action. Plaintiffs define the class as:

> [a]ll children who are or will be in the custody of the New York City Child Welfare Administration ("CWA"), and those children who, while not in the custody of CWA, are or will be at risk of neglect or abuse and whose status is known or should be known to CWA.

Plaintiffs' Notice of Motion for Class Certification at 1. To be eligible for class certification, plaintiffs first must show that the proposed class satisfies all four requirements of Rule 23(a). *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir.1992), *cert. dismissed*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993). Once this has been done, plaintiffs must show that the putative class falls into one of the categories of maintainable actions under Rule 23(b). *See Brown v. Giuliani*, 158 F.R.D. 251, 269 (E.D.N.Y.1994); *Jane B. ex rel. Martin v. New York City Dep't of Social Servs.*, 117 F.R.D. 64, 71 (S.D.N.Y.

1987). Plaintiffs in the instant case seek certification pursuant to Rule 23(b)(2).

### A. *Rule 23(a)*

Rule 23(a) provides for class certification

> only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Plaintiffs argue that they easily meet all four prerequisites of the rule. Defendants, however, challenge the issues raised by the proposed class as lacking commonality and the claims of the representative parties as lacking typicality. Additionally, defendants argue that the class as defined is overbroad and unmanageable.

### (1) *Numerosity*

The proposed class is undeniably large and defendants do not challenge certification on the grounds that the class fails to meet the numerosity requirement of Rule 23(a)(1). To the contrary, City defendants urge this Court to deny the motion for certification because "[n]o case yet reported has even attempted to deal with a class of this size in a system of this size and complexity." City Defendants' Memorandum of Law Opposing Class Certification at 6 [hereinafter "City Defs.' Mem. in Opp'n"]. Despite the potential problems raised by a class of this size, the relevant inquiry for certification purposes, however, is whether the class is "so numerous that joinder of all members is impracticable." Fed. R.Civ.P. 23(a)(1).

■ Plaintiffs need not establish the exact number of potential class members as the courts are empowered to "make 'common sense assumptions' to support a finding of numerosity." *German v. Federal Home Loan Mortgage Corp.*, 885 F.Supp. 537, 552 (S.D.N.Y.1995) (citation omitted). As proposed, the class includes the approximately 43,000 children in ACS custody as well as thousands who are not in custody but are at risk of abuse and neglect and whose status is

or should be known to ACS. Indeed, if certified, this class would number well over 100,000 children. A class of this size easily satisfies Rule 23(a)(1). *See Robidoux v. Celani,* 987 F.2d 931, 935–36 (2d Cir.1993); *Trautz v. Weisman,* 846 F.Supp. 1160, 1166 (S.D.N.Y.1994); *Kendrick v. Sullivan,* 784 F.Supp. 94, 104–06 (S.D.N.Y.1992).

Defendants' argument that the class is so broad as to be unmanageable is without merit. Plaintiffs cite several cases in the child welfare context where courts have certified classes similar to the one proposed in the instant case. *See, e.g., Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48 (3d Cir.1994); *Angela R. ex rel. Hesselbein v. Clinton,* 999 F.2d 320, 322 (8th Cir.1993); *Jeanine B. ex rel. Blondis v. Thompson,* 877 F.Supp. 1268, 1288 (E.D.Wis.1995); *David C. ex rel. Brown v. Leavitt,* 1993 WL 764518, at *1 (D.Utah May 7, 1993); *LaShawn A. v. Dixon,* 762 F.Supp. 959, 994 n. 28 (D.D.C.1991), *aff'd on other grounds,* 990 F.2d 1319 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 659 (1994), *appeal after remand,* 69 F.3d 556 (D.C.Cir.1995), *judgment vacated and rehearing en banc granted,* 74 F.3d 303 (D.C.Cir.1996); *Aristotle P. v. Johnson,* 1989 WL 121210, at *2 n. 1 (N.D.Ill. Oct. 3, 1989). Indeed, as plaintiffs note, the size of the proposed class is largely irrelevant except as it pertains to the numerosity requirement of Rule 23(a)(1) which defendants concede clearly is satisfied in this case.

### (2) Commonality

The parties' first significant point of contention is whether the proposed class meets the commonality requirement of Rule 23(a)(2). That requirement is satisfied if "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Defendants argue that the only common thread linking plaintiffs' claims is that they all challenge the practices of one City agency, ACS. Other than that, defendants suggest that plaintiffs are a disparate group which has filed too many claims alleging too many legal violations based on too many factual circumstances to be combined into one lawsuit.

Rule 23(a)(2) "will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994); *see also In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145, 166–67 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988). Indeed, a single common question may be sufficient to satisfy this rule. *See Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 198 (S.D.N.Y.1992). Plaintiffs identify their common question of law as whether each child has a legal entitlement to the services of which that child is being deprived. Further, plaintiffs identify their common question of fact as whether defendants systematically have failed to provide these legally mandated services. The Court is satisfied that these questions are common to the entire class despite any differences in the individual situations of each named plaintiff.

Once a common question is identified, "differences among the questions raised by individual members [of the class] will not defeat commonality." *German v. Federal Home Loan Mortgage Corp.,* 885 F.Supp. 537, 553 (S.D.N.Y.1995). Factual differences in the individual claims, therefore, are not fatal. *See Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979); *Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51, 55 (S.D.N.Y.1993); *Bishop v. New York City Dep't of Hous. Preservation & Dev.,* 141 F.R.D. 229, 238 (S.D.N.Y.1992). As one court has noted, "(b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Baby Neal,* 43 F.3d at 57. The unique circumstances of each child do not compromise the common question of whether, as plaintiffs allege, defendants have injured all class members by failing to meet their federal and state law obligations. Indeed, as plaintiffs argue, the actions or inactions of defendants are not isolated or discrete instances but, rather, form a pattern of behavior that

commonly affects all of the proposed class members.

Further, Rule 23(a)(2) does not require that plaintiffs all suffer the same actual injury. Rather, plaintiffs can establish commonality by "demonstrating that all class members are *subject* to the same harm...." *Id.* at 56 (emphasis added). Here, plaintiffs allege systemic violations of federal and state law resulting in the deprivation of services to which they claim they are entitled. Each member of the proposed class, regardless of that child's current circumstance, is at risk of suffering the harm of which the named plaintiffs complain.

Finally, that the relief sought is injunctive in nature further supports a finding of commonality in satisfaction of Rule 23(a)(2). Indeed, "injunctive actions 'by their very nature often present common questions satisfying Rule 23(a)(2).'" *Id.* at 57 (quoting 7A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1763, at 201 (1986)). Plaintiffs do not ask this Court to make individualized damage awards based on the distinct claims of each plaintiff but rather ask for declaratory and injunctive relief applicable to the class as a whole. For the foregoing reasons, the Court finds that plaintiffs have satisfied Rule 23(a)(2) for purposes of class certification.

### (3) *Typicality*

Closely related to the commonality requirement of Rule 23(a)(2) is the typicality requirement of Rule 23(a)(3). This prerequisite to class certification poses the second significant point of contention between the parties and demands a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Rule 23(a)(3) functions to ensure that "the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 57 (3d Cir.1994). City defendants argue, however, that "[a] plaintiff claiming injury from one type of alleged violation can not [sic] thereby be typical of a class that may be injured by some other type of violation." City Defs.' Mem. in Opp'n at 14.

A proposed class satisfies Rule 23(a)(3) if "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir.1993). The rule is satisfied, therefore, if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members. *See Baby Neal,* 43 F.3d at 58. Indeed, "[t]here is no requirement that the factual basis for the claims of all members of a purported class be identical." *Wilder v. Bernstein,* 499 F.Supp. 980, 992 (S.D.N.Y. 1980); *see also Robidoux,* 987 F.2d at 936–37.

In the instant case, the central claim of the named plaintiffs is that defendants have engaged in and continue to engage in a course of conduct which deprives plaintiffs of services to which they are entitled and thus violates their constitutional and statutory rights. This claim certainly is typical of that of the proposed class members who likewise are challenging defendants' practices. Where, as here, an action challenges a pattern of activity, the named plaintiffs can represent class members who suffer different injury "so long as all the injuries are shown to result from the practice." *Baby Neal,* 43 F.3d at 58.

Additionally, the nature of the relief sought favors a finding that the claims of the named plaintiffs are typical of the class. This Court is empowered to certify a class despite the unique circumstances of each plaintiff as long as the relief sought is based on the same legal theory. *See Jane B. ex rel. Martin v. New York City Dep't of Social Servs.,* 117 F.R.D. 64, 70 (S.D.N.Y.1987). Indeed, that plaintiffs ask this Court for declaratory and injunctive relief for the class as a whole provides ample basis for a finding that the claims of the named plaintiffs are typical of those of the proposed class in satisfaction of Rule 23(a)(3).

(4) *Representativeness*

■ The Second Circuit has held that plaintiffs must satisfy a two-pronged test to meet Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). First, the Court must determine whether class counsel is qualified, experienced, and generally able to conduct the litigation. *See In re Drexel Burnham Lambert Group*, 960 F.2d 285, 291 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993). Next, the Court must establish that the proposed class members do not have interests antagonistic to one another. *See id.* Because defendants do not challenge the adequacy of counsel, the Court will address only the second element.

Defendants take a narrow view of the potential for conflict and suggest that, because the actual relief sought by individual class members may contradict that sought by other class members, the named plaintiffs cannot fairly represent the class. For example, defendants suggest that relief sought by children who look to remain with their families may run directly counter to relief sought by children who need to be removed from their homes. Additionally, defendants argue that different categories of plaintiffs may be in competition for the finances needed to provide them with relief. Both of these arguments are without merit.

The Court is inclined to take a much broader view of the relief sought in the instant case. Plaintiffs, whether they need to be reunited with their biological families or removed from them, all seek declaratory and injunctive relief which would require defendants to comply with federal and state law. Plaintiffs do not ask this Court to adjudicate individual claims or to establish policies with respect to any particular situation. Rather, plaintiffs allege systemic failures which, if remedied, would result in defendants providing plaintiffs with services appropriate to their individual situations and regardless of outcome. The Court fails to see how institutional reform such as this raises potential conflicts among class members such that certification should be denied.

B. *Rule 23(b)(2)*

The prerequisites of Rule 23(a) having been satisfied, plaintiffs now must show that the proposed class falls into one of the three categories of maintainable actions under Rule 23(b). To that end, plaintiffs rely on Rule 23(b)(2) which provides for certification if:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . .

Fed.R.Civ.P. 23(b)(2).

Rule 23(b)(2) is designed to assist and is most commonly relied upon by litigants seeking institutional reform in the form of injunctive relief. *See Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58–59 (3d Cir.1994); 1 H. Newberg, *Newberg on Class Actions* § 4.11, at 291 (2d ed. 1985). Several courts, including this one, have certified classes under Rule 23(b)(2) where, as here, the relief sought is injunctive and would benefit all class members. *See, e.g., Brown v. Giuliani*, 158 F.R.D. 251, 269 (E.D.N.Y.1994); *Jane B. ex rel. Martin v. New York City Dep't of Social Servs.*, 117 F.R.D. 64, 71 (S.D.N.Y. 1987); *Wilder v. Bernstein*, 499 F.Supp. 980, 994 (S.D.N.Y.1980). In fact, one court has gone so far as to suggest that Rule 23(b)(2) "is almost automatically satisfied in actions primarily seeking injunctive relief." *Baby Neal*, 43 F.3d at 58 (discussing *Weiss v. York Hospital*, 745 F.2d 786, 811 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985)).

The instant case poses exactly the situation contemplated by Rule 23(b)(2). An order requiring defendants to comply with federal and state law in order to remedy the systemic failures that are the source of plaintiffs' claims constitutes relief that would serve the entire putative class. Certification of the proposed class, therefore, is both necessary and appropriate given the nature of the allegations and of the relief sought. Because plaintiffs have met all four prerequisites of Rule 23(a) and have set forth an action main-

tainable pursuant to Rule 23(b)(2), their motion to certify the class is hereby granted and the class is defined as:

[a]ll children who are or will be in the custody of the New York City Administration for Children's Services ("ACS"), and those children who, while not in the custody of ACS, are or will be at risk of neglect or abuse and whose status is known or should be known to ACS.

### III. *Motion for Bifurcation*

■ City defendants move for an order of this Court bifurcating this action into two phases for purposes of discovery and trial. Defendants ask the Court to conduct a Phase One trial "to determine whether or not any individual plaintiff can actually prove any violation of his or her legal rights by an employee of the institutional defendants." Affirmation of Grace Goodman in Support of Defendants' Motion to Bifurcate this Action and Stay Classwide Discovery Until Phase II at 2 [hereinafter "Goodman Affirmation"]. Defendants further ask the Court to conduct a Phase Two trial once certain violations are proven "to determine ... whether they are a result of a widespread policy or practice of defendants, such that the institutional defendants could be liable under federal law and such that system-wide injunctive relief could be appropriate." Goodman Affirmation at 2.

■ This Court is authorized to bifurcate a trial pursuant to Rule 42(b), Fed. R.Civ.P., which provides, in pertinent part:

[t]he court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim ... or of any separate issue or of any number of claims....

Fed.R.Civ.P. 42(b). Bifurcation, however, is a procedural device to be employed only in exceptional circumstances. *See Sunenblick v. Harrell,* 145 F.R.D. 314, 317 (S.D.N.Y. 1993). Indeed, bifurcation is only appropriate either where (1) separate trials would promote judicial economy and convenience or (2) a single trial would prejudice the interests of a party. *See Katsaros v. Cody,* 744 F.2d 270, 278 (2d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Buscemi v. Pepsico, Inc.,* 736 F.Supp. 1267, 1271–72 (S.D.N.Y.1990). Defendants suggest that bifurcation would promote judicial economy and convenience.

In the instant opinion, this action has been certified as a class action pursuant to Rule 23, Fed.R.Civ.P., and will proceed on that basis. To bifurcate this matter in the manner proposed by defendants would undermine the class action status afforded plaintiffs by this Court. Additionally, this Court is not convinced that judicial economy would be served by a trial in two phases where, undoubtedly, there would be significant overlap in the evidence presented and, consequently, delay in reaching the merits of the classwide claims. Finally, where in a class action context the only remedy sought is broad declaratory and injunctive relief applicable to the class as a whole, defendants' claims of potential prejudice are unfounded. City defendants' motion to bifurcate this action is, therefore, denied.

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., are denied to the extent that (1) custodial plaintiffs may pursue their substantive due process claims based on alleged violations of their right to be free from harm and all plaintiffs may pursue their procedural due process claims based on alleged violations of various provisions of New York's Child Protective Services laws, codified at Title 6 of Article 6 of the New York Social Services Law; (2) plaintiffs may pursue their federal statutory claims based on the Adoption Assistance and Child Welfare Act, including the provision herein referred to as the Multiethnic Placement Act, the Child Abuse Prevention and Treatment Act, the Americans with Disabilities Act, and the Rehabilitation Act; and (3) plaintiffs may pursue their state law claims. Further, plaintiffs' motion for class certification pursuant to Rule 23, Fed.R.Civ.P., is granted. Finally, City defendants' motion to bifurcate this action is denied.

Settle order on notice.